Filed 9/25/20  In re Devin G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DEVIN G. et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>S.A.,<br><br>          Defendant and Appellant. | A160174<br><br>(Solano County Super. Ct. Nos. J44368, J44370) |

S.A. (mother), the mother of eight-year-old Devin G. and five-year-old Dante G., appeals from juvenile court orders terminating her parental rights under Welfare and Institutions Code section 366.26.[1]  Mother contends that the court erred by finding both children adoptable.  We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

In January 2019, a Vallejo police officer discovered then six-year-old Devin and three-year-old Dante living in an abandoned building with mother and her boyfriend. Mother appeared to be under the influence of methamphetamine, to which she later admitted being addicted along with marijuana. She also stated that her boyfriend physically abused Devin, who had "numerous bruises [on] his body consistent with the marks of a belt."

Later that month, the Solano County Health and Social Services Department (Department) filed a petition alleging that the juvenile court had jurisdiction over Devin and Dante under section 300, subdivisions (b) and (j), based on the boys' "unhealthy living environment," mother's substance abuse, and mother's boyfriend's excessive discipline of Devin.[2] In addition, jurisdiction was alleged under section 300, subdivision (g), based on the unknown whereabouts of Devin and Dante's father, who was reportedly also homeless.[3] The court ordered the children detained, and they were placed together in a foster home. Mother was allowed to have supervised weekly visits with them.

The March 2019 jurisdiction/disposition report stated that Devin and Dante "exhibited some behavioral issues that the caregiver is addressing" but "adjusted well to placement overall." Devin, who apparently had never attended school before, was having academic difficulty in first grade, and he exhibited "oppositional" behavior, including "pushing a chair on another

---

[2] The petition also alleged jurisdiction over Devin and Dante's then 15-year-old sister, who was not living with mother at the time. This appeal does not involve the sister.

[3] The Department was unable to locate the children's father, who never appeared in the case and remained an alleged father.

child" and "tying a jump rope around his neck while on the playground." Dante also had behavioral issues at preschool, "such as biting the teacher and spitting at others." Mother had a visit with the boys soon after they were detained, during which Dante acted out by throwing toys and Devin "made some comments that made . . . mother sad such as 'that's what you get' when Dante [threw] a toy at her." Mother did not attend any of her subsequent weekly visits, cancelling each time because of "transportation issues."

In late March, after mother submitted, the juvenile court found true all the petition's allegations under section 300, subdivisions (b), (g), and (j). The court ordered reunification services for mother and continued her visitation. Her case plan required mother to submit to random drug testing, find stable housing, and take parenting education classes.

The September 2019 six-month-review report stated that according to his therapist, Devin had "a limited set of social skills," showed "physical aggression [and] . . . poor boundaries," and was "easily dysregulated." He continued to have trouble in school, with several "referrals for major behavioral violations" that included "assaulting peers." The foster caregiver reported that he "walk[ed] around the house most of the night," getting only two to three hours of sleep. In addition, the caregiver reported "sexualized behaviors," including "openly masturbat[ing]" and "attempting to have anal sex" with Dante. Devin was diagnosed with PTSD and ADHD, and the juvenile court granted his physician's application to prescribe psychotropic medication for him.[4]

---

[4] Several months later, in renewing the application for psychotropic medication, Devin's physician indicated Devin was "respond[ing] well to the combination of [medication], [individual therapy], and stable adult supports/relationships."

Dante also exhibited dysregulation in the classroom. He was "known to throw chairs, toys[,] and books unprovoked" and to "scream[] profanity at his peers and hit[] them with objects." Dante had difficulty expressing himself, and his "cognitive development" was "less sophisticated." Dante was also described, however, as "generally friendly and loving."

Meanwhile, during the reporting period mother missed all her drug tests. She refused to participate in a residential treatment program, and she did not seek other help for substance abuse as she had promised. She made some progress in looking for housing, however, and she regularly visited with Devin and Dante. Her supervision of the children during these visits was deemed "adequate," although she sometimes "bec[ame] overwhelmed with [their] behaviors." Given mother's overall failure to demonstrate her "potential or ability to meet the emotional, developmental[,] or physical needs of the minors," the Department recommended termination of her reunification services.

Mother appeared at the scheduled six-month review hearing in late September. Her counsel reported that she had a positive drug test that morning, but she "very well could go through detox and into a program in the next week or two," and counsel requested a contested hearing to give mother time to demonstrate "an active effort in dealing with the substance abuse issues." The juvenile court set a contested hearing for late October, but mother did not appear at it. After stating that mother had not entered treatment, her counsel objected but submitted on the Department's recommendation that her reunification services be terminated. The court then ordered her services terminated and set a selection-and-implementation hearing under section 366.26. Mother was allowed to continue supervised visits with the boys.

4

The section 366.26 report filed in February 2020 recommended that parental rights to Devin and Dante be terminated and adoption be both children's permanent plan. The foster caregiver reportedly "fe[lt] enormous fondness for the boys, but [was] unable to provide them with permanency," and they began living with a prospective adoptive father in a certified foster family home in late January 2020.[5] The prospective adoptive father reported that the children "ha[d] adjusted rapidly and well" to their placement. Concerns about Devin's sexual behavior toward Dante still existed, although the boys now had separate bedrooms and were subject to "increased supervision."

Mother initially balked at a permanent plan of adoption, but she also told the social worker that the boys " 'need[ed] a man as a role in model in their life,' suggesting implicit support." She later met the prospective adoptive father, who "indicated he would like [to] support [Devin and Dante's] ongoing contact with her." Though mother "clearly love[d] the boys" and "attended most of her visits" with them, her "lack of parenting skills was acutely evident" and she was more like "a friendly, occasional visitor that stirs antagonism and frustration." For example, at one visit in late January, "Devin was visibly distressed while waiting for [her] to arrive and expressed anger and frustration. He grabbed each of the half dozen teddy bears in the room and in turn punched them in the face with a closed fist and pretended to cut their throats, . . . [and] the entire visit mostly 'consisted of fighting and violence.' "

---

[5] Mother insinuates the caregiver was unable to provide permanency because of the boys' behavioral problems, but the record does not reveal the caregiver's reasons for not seeking to adopt.

The section 366.26 report concluded that Devin and Dante were "generally adoptable children" with "enormous potential to live successful lives." It stated that both boys "have engaging and warm personalities and are overall friendly and happy children who exude a sense of fun and playfulness." Devin continued to struggle academically and Dante had "some speech deficits," but they were "physically healthy" and "meeting many of their developmental milestones." The report acknowledged the boys' "trauma . . . [was] evident in their adverse behavior," including Devin's continuing "extreme sexualized behaviors" and both children's dysregulation. But the report also concluded that "they clearly have the capacity to attach and bond to healthy parental figures," as demonstrated by their bonding with their foster caregiver, and that their new "permanent home, with its consistent nurturing and loving parenting, [would] allow [them] to heal from the trauma they have experienced and reduce their adverse behavioral responses."

Mother, who did not visit with the boys after late January, did not appear at the section 366.26 hearing on April 6, 2020. Her counsel objected to termination of her parental rights but submitted on the section 366.26 report. The juvenile court found by clear and convincing evidence that Devin and Dante were generally and specifically adoptable and terminated parental rights to both children.

II.
DISCUSSION

Mother's sole contention on appeal is that insufficient evidence supports the juvenile court's conclusion that Devin and Dante were adoptable. We are not persuaded.

Before selecting adoption as a permanent plan at a section 366.26 hearing, a juvenile court must find by clear and convincing evidence that the child is " ' "likely to be adopted" ' " within a reasonable time [citations], which

6

is a 'low threshold.' " (*In re Mary C.* (2020) 48 Cal.App.5th 793, 803; § 366.26, subd. (c)(1).) "The question of adoptability usually focuses on whether the child's age, physical condition[,] and emotional health make it difficult to find a person willing to adopt that child" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231), and "[t]he likelihood of adoptability may be satisfied by a showing that a child is generally adoptable, . . . independent of whether there is a prospective adoptive family ' " 'waiting in the wings.' " ' " (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313, italics omitted.) "However, the case law also recognizes that the juvenile court may properly consider a prospective adoptive parent's willingness to adopt as evidence that the child is likely to be adopted within a reasonable time." (*Ibid.*) Thus, a child may be found specifically adoptable based on an adult's willingness to adopt, even if the child " 'ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability.' " (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.)

We review the juvenile court's determination that a child is adoptable for substantial evidence. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.) In doing so, we ask "whether the record as a whole contains substantial evidence from which [the juvenile court] could have found it highly probable that" the child was likely to be adopted (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011), "giv[ing] the court's finding of adoptability the benefit of every reasonable inference and resolv[ing] any evidentiary conflicts in favor of affirming." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)

Most of mother's arguments on appeal focus on the dearth of information about the prospective adoptive father, as mother claims his "desire to adopt the children was not sufficient clear and convincing evidence to support the adoptability finding." In particular, even though she did not

7

object below to the sufficiency of the section 366.26 report, she claims the Department failed to provide the statutorily required "preliminary assessment of the eligibility and commitment of [the adoptive father] . . . to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the [children's] needs, and the understanding of the legal and financial rights and responsibilities of adoption." (§ 366.21, subd. (i)(1)(D); see § 366.26, subd. (b).)

We need not resolve the parties' dispute about the sufficiency of the evidence of Devin's and Dante's specific adoptability, because there was substantial evidence to support the juvenile court's finding that they were generally adoptable. (See *In re R.C.*, *supra*, 169 Cal.App.4th at pp. 493–494 [if a child "is adoptable based on factors in addition to a caregiver's willingness to adopt, the suitability or availability of the caregiver to adopt is not a relevant inquiry"]; see also *In re Mary C.*, *supra*, 48 Cal.App.5th at p. 802.) "A child's young age, good physical and emotional health, intellectual growth[,] and ability to develop interpersonal relationships are all attributes indicating adoptability." (*In re Gregory A.*, *supra*, 126 Cal.App.4th at p. 1562.) The evidence here showed that, in addition to being quite young, Devin and Dante were in good physical health, were developing mostly normally, and were able to bond with caregivers. The boys had behavioral problems at school, but there were no major concerns about their intellectual capabilities, and they were described as friendly and loving. Although both children, especially Devin, had challenging issues due to childhood trauma, they showed improvement and were judged capable of leading successful lives. And finally, though we do not rely solely on the prospective adoptive father's willingness to adopt to uphold the court's adoptability finding, we

note that " ' "[u]sually, the fact that a prospective adoptive parent has expressed interest in adopting" ' " is *itself* evidence of adoptability, because it indicates that whatever problems a child may have, they " ' "are not likely to dissuade individuals from adopting [him or her]." ' " (*Ibid.*)

In arguing there was nevertheless insufficient evidence of adoptability, mother provides a laundry list of both children's problems, including their poor behavior in school and Devin's sexualized behaviors. But she does not cite any case law to suggest these issues "were so severe as to make the [juvenile] court's finding of adoptability unsupported" (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154), particularly in light of the evidence of the boys' positive traits discussed above. As a result, she fails to convince us that insufficient evidence demonstrated Devin and Dante were likely to be adopted.

III.
DISPOSITION

The orders terminating parental rights to Devin and Dante are affirmed.

9

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Sanchez, J.

*In re Devin G.* A160174